## Bell National Bank of Pineville v. Green et al.
## Green et al. v. Howard.

(Decided Feb. 22, 1935.)

(As Modified on Denial of Rehearing March 22, 1935.)

318

CLEON K. CALVERT for Receiver of Bell Nat. Bank.

JAMES S. WILSON and JAMES H. JEFFRIES for Martin Green et al.

W. T. DAVIS for Josh Howard.

OPINION OF THE COURT BY JUDGE STITES—Affirming in part and reversing in part.

Two separate appeals are prosecuted herein upon the same record. The receiver of the Bell National Bank of Pineville appeals from so much of the judgment as allows a priority (and interest thereon) in the assets of the closed bank to the plaintiff Martin Green. The plaintiff appeals from so much of the judgment as adjudges a lien in favor of the appellee Josh Howard upon certain property mortgaged to him by plaintiff.

On April 10, 1931, plaintiffs Martin and Nancy Green borrowed $4,400 from Josh Howard, giving him their joint note, payable on or before one year from date, and secured by a mortgage on their farm. Early in January, 1932, plaintiffs secured a loan from Dr. Garfield Howard of $4,780.30, evidenced by a check for that amount drawn on a bank in Williamsburg, Ky. Plaintiff Martin Green deposited the Williamsburg check to the credit of his general banking account in the Bell National Bank on January 11, 1932.

On the same day (January 11, 1932) plaintiff signed a check to the order of Josh Howard for the amount of his obligation to Howard, but this check was never delivered, although plaintiff made an earnest effort to get it into the hands of the payee. Plaintiff turned the check over to the cashier of the Bell National Bank for delivery to Howard on Friday, January 15, 1932, and Howard came to Pineville for the purpose of receiving payment of the debt, but was unable to establish contact with the cashier, who was absent from the bank.

The following day was Saturday, January 16, 1932. The Bell National Bank closed at noon. On Sunday, January 17, 1932, its directors voted to keep it closed, and it has never reopened. Payment of all claims against it in full is, as yet, expressed in terms of hope.

Without detailing the methods through which the questions were finally raised, it will suffice to say that the following points are presented for our determination: (1) Was the debt to the appellee Josh Howard paid? (2) Is the plaintiff entitled to priority in the assets of the defunct bank? (3) If entitled to priority, is the plaintiff likewise entitled to interest on the amount of his claim?

We are of the opinion that the chancellor was correct in his determination that the debt to appellee Josh Howard was not paid and that the testimony adduced did not show an acceptance by Josh Howard of the plaintiff's check in payment of his claim.

Whether or not plaintiff is entitled to priority in the payment of his claim against the estate of the Bell National Bank is a more serious question. When he deposited the Williamsburg check on January 11, 1932, he signed the regular form of deposit slip containing conditions (designed to meet the decisions of the Supreme Court of the United States in City of Douglas v. Federal Reserve Bank, 271 U. S. 489, 46 S. Ct. 554, 70 L. Ed. 1051, and Federal Reserve Bank v. Malloy, 264 U. S. 160, 44 S. Ct. 296, 68 L. Ed. 617, 31 A. L. R. 1261) providing:

"In receiving items for deposit or collection, this bank acts only as depositor's agent. * * * All items credited subject to final payment in cash or solvent credits. * * *"

Aside from this agreement, the Uniform Bank Collection Code (Acts 1930, c. 13, sec. 2, Ky. Stat. Supp. 1933, sec. 3720b-69a-1) gave statutory recognition to the relationship, and it applied to a solvent national bank as well as to a state bank. Jennings v. United States Fidelity & Guaranty Co., 55 S. Ct. 394, 395, 79 L. Ed. 355, decided February 4, 1935; Old Company's Lehigh, Inc., v. Meeker et al., 55 S. Ct. 392, 79 L. Ed. 361, decided February 4, 1935.

We think that it is clear that the relationship of principal and agent was created between the plaintiff and the Bell National Bank upon the making of the deposit. A fiduciary relationship existed between the parties, and the general rules applicable to the tracing of trust property applied. See article by Prof. Williston, 2 Harvard Law Review 28.

It is argued that we are to apply the principles enunciated or approved by the federal courts in reaching our determination of the question of priority of claims against the estate of an insolvent national bank, and we think this is correct. National banking associations are instrumentalities of the central government. The state law is applicable to them only "so far as it is consistent with the policy or provisions,

express or reasonably implied, of the National Bank Act (12 USCA sec. 21 et seq.) or of other federal acts of paramount authority." Jennings v. U. S. Fidelity & Guaranty Co., supra. However, the federal courts have followed the general principles of equity in these matters, and while we have been perhaps more liberal in the application of the principles announced by Sir George Jessel in Knatchbull v. Hallet, [1879] 13 Ch. Div. 696, in the matter of presumption against dissipation of trust funds,† still, as to the question here presented, we find no difference between the Kentucky rules and the rules announced by the federal courts.

The premise must be borne in mind, in reading the decisions of the Supreme Court, that they have largely been concerned with cases involving a debtor-creditor relatonship between a depositor and a bank, such as existed in City of Douglas v. Federal Reserve Bank, supra, while we are here dealing with the relationship of principal and agent as between the plaintiff and the bank.

The Williamsburg check was a chose in action. Title to the check remained in the plaintiff so long as it remained a chose in action, and this title was transferred to the fund in payment of the check immediately upon the payment at Williamsburg. Plaintiff's title to the fund continued until the proceeds of the check reached the bank at Pineville, and an unconditional credit was given to the plaintiff on the books of the Pineville bank. There was no showing that an unconditional credit was given on this check prior to Saturday, January 16, 1932, the last day that the bank was open.

The length of time consumed in clearing an item between Pineville and Williamsburg is fixed all the way

---

† In Farmers' Bank v. Bailey, 221 Ky. 55, 297 S. W. 938 (second appeal 227 Ky. 179, 12 S. W. [2d] 312), the amount of cash on hand into which the trust fund was traced was shown only as of the date of the closing of the bank. It was not shown whether this cash balance was ever less than this amount between the date when the trust fund was created and the date when the bank closed. However, on the facts presented in that case, we held that we would presume that this was the lowest amount held by the bank at any time between the receipt of the trust fund and the time of its closing. It will be observed that the question was purely one of shifting the burden of proof. This is the only point on which we find ourselves at variance with the general rules as applied in the federal courts.

from four to eight days by various witnesses. According to the cashier of the Bell National Bank, the customary routing for such a check would be from Pineville to Louisville to Cleveland to Williamsburg, and the return credit would travel from Williamsburg to Cleveland to Louisville to Pineville. It is not startling, therefore, that so long a period as eight days might elapse in completing the transaction and before an unconditional credit was given to a depositor at Pineville. The vice president of the Bell National Bank, in active charge of its affairs, testifies that he would not have "O. K.'d" the payment of a check as large as the check to Josh Howard against the Williamsburg credit on January 15, 1932. This is the earliest day fixed by any witness as to when the credit *could* have reached Pineville. The only day, therefore, on which the proceeds of the check could have been paid into the bank was the last day that the bank functioned, to wit, Saturday, January 16, 1932. Conceivably, the proceeds of the check may have come in from Williamsburg on that day. There is no showing that the check from Williamsburg was in the form of cash, except the testimony of the receiver that the Williamsburg check was *paid* and cleared and that the balance of the fund (less certain minor checks not here involved) in the amount of $4,-586.36 is still in the estate.

Whether the proceeds of the check from Williamsburg were in the form of cash or in the form of a "cash item" is immaterial since it was admittedly paid. Schumacher v. Harriett (C. C. A.) 52 F. (2d) 817, 82 A. L. R. 1. If it was "paid," it unquestionably augmented the cash assets coming into the hands of the receiver. In Smith v. Mottley (C. C. A. 6) 150 F. 266, 268, the trust fund in question was received by the bank ten days before it made an assignment for the benefit of creditors. It was shown that cash in excess of the trust fund remained in the bank up to the time of the assignment and came to the assignee. The court, in an opinion by Judge Severens, concurred in by Judge Lurton and Judge Richards, said:

"In the absence of any proof to the contrary, the reception of the funds being so near to the assignment by the bank, it may be presumed that the assets which came to the hands of the trustee were augmented by the appropriation of the proceeds of

the check. If it were not so, the burden was on the trustee to prove it; or, if not augmented to the whole amount of the check, then to what amount they had been lost out. It is shown that three times the amount of this fund remained in the bank to the time of the assigment and came to the trustee. The burden of showing that his property has been wrongfully mingled in a mass of the property of the wrongdoer is upon the owner; but, when this is done, the burden shifts to the wrongdoer. It is for him to distinguish between his own property and that of the innocent party." (Citing cases.)

In the case at bar it is admitted that a sum in cash greater than the amount of the Williamsburg check was continuously in the bank during all the period when credit on the Williamsburg check could have been received and that this sum in cash came into the hands of the receiver.

In the case of Jennings v. United States F. & G. Co., 55 S. Ct. 394, 395, 79 L. Ed. 355, referred to above, the Supreme Court had for consideration the application of the Indiana Uniform Bank Collection Code (Acts Ind. 1929, c. 164) between the bank of deposit and an intermediate agent collecting bank. The court said:

"There was in force in Indiana in 1931 a statute known as the Bank Collection Code [Indiana Acts 1929, c. 164], which is applicable to national banks in so far as it is consistent with the policy or provisions, express or reasonably implied, of the National Bank Act [12 USCA sec. 21 et seq.] or of other federal acts of paramount authority. Lewis v. Fidelity & D. Co., 292 U. S. 559, 566, 54 S. Ct. 848, 78 L. Ed. 1425, 1431, 92 A. L. R. 794; First National Bank v. Missouri, 263 U. S. 640, 656, 44 S. Ct. 213, 68 L. Ed. 486, 492. Under that Code [sec. 2], the relation between the forwarding bank and the collecting bank is that of principal and agent until the agent has completed the business of collection. *Whether a fiduciary relation continues even afterwards, upon the theory that the proceeds of the collection until remitted to the forwarder are subject to a trust, depends upon the circumstances.* In the absence of tokens of a contrary intention, the better doctrine is, where the common law prevails, that the agency of the collecting bank

is brought to an end by the collection of the paper, the bank from then on being in the position of a debtor, with liberty, like debtors generally, to use the proceeds as its own.''

By section 2 of the Uniform Bank Collection Code, as adopted in Kentucky (Acts 1930, c. 13), it is provided:

"Except as otherwise provided by agreement and except as to subsequent holders of a negotiable instrument payable to bearer or endorsed specially or in blank, where an item is deposited or received for collection, the bank of deposit *shall be agent of the depositor for its collection* and each subsequent collecting bank shall be sub-agent of the depositor but shall be authorized to follow the instructions of its immediate forwarding bank and any credit given by any such agent or sub-agent bank therefor shall be revocable until such time as the proceeds are received in actual money or an unconditional credit given on the books of another bank, which such agent has requested or accepted. Where any such bank allows any revocable credit for an item to be withdrawn, such agency relation shall nevertheless continue except the bank shall have all the rights of an owner thereof against prior and subsequent parties to the extent of the amount withdrawn.''

As we have pointed out above, it is possible, though not probable, that the proceeds of the Williamsburg check might have come in during the three or four hours that the bank was open on Saturday, January 16, 1932, and that the bank thereupon gave an unconditional credit on its books to Martin Green and created thereby a debtor-creditor relationship between itself and Mr. Green. However, we are met on this proposition by the fact that the bank was undoubtedly insolvent at the time, and by the further fact that the plaintiff has traced his money directly into the cash assets coming into the hands of the receiver.

The case of Kincheloe v. Bank of Hardinsburg & Trust Co., 246 Ky. 1, 54 S. W. (2d) 384, 385, 84 A. L. R. 1530, relied on by the receiver, is not contrary to the decision here. In that case, the bank was held to be the agent of its customer "to collect the proceeds of the

coupons and bonds called or sold and to hold such proceeds as the debtor of the appellant subject to his call and direction." There was no question in that case but that the bank was simply a debtor and the customer a general creditor, while in the case at bar the plaintiff has shown, at least prima facie, that the bank never became his debtor, or, if it did voluntarily become his debtor, this step was taken after it was hopelessly insolvent, when it had no right to do so, and within a space of four hours before actual closing. In the Kincheloe case, the customer became a general creditor before insolvency; here, if plaintiff became a general creditor at all, it was after insolvency.

In view of the foregoing, we feel justified in sustaining plaintiff's claim to the extent of the balance admitted to be in the hands of the receiver, to wit, $4,586.36. This is all of the specific fund that has been traced into the hands of the receiver and to which plaintiff may claim title.

The lower court allowed interest on the plaintiff's claim from January 11, 1932. This was plainly an error. The estate in the hands of the receiver was in equity the property of the general creditors of the bank. Any obligation paid by the estate must naturally be paid at the expense of other creditors. Plaintiff is entitled to a priority, not a preference. He is entitled to the principal of the fund which he seeks to recover, not on the theory that it is a debt owed to him, but on the theory that he has a *title* to the specific funds sought to be recovered. The fallacy of allowing interest on such a fund thus becomes apparent.

Of course, plaintiff is entitled to assert the full amount of his claim and interest in the form of a general claim against the estate, and in the event that it should pay general creditors in full plaintiff will then receive the full amount due him, together with interest.

There are other errors complained of, which we do not deem it necessary to notice, under the views we have here expressed.

Upon the appeal by the plaintiff from so much of the judgment as adjudges the validity of the debt of Josh Howard and the enforcement of his lien, the judgment is affirmed. On the appeal of the receiver, the judgment is reversed for proceedings consistent herewith.